IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BANCROFT LIFE & CASUALTY           §
ICC, LTD.,                         §
                                   §
                    Plaintiff,     §
                                   §
VS.                                §    CIVIL ACTION H-11-2384
                                   §
FFD RESOURCES II, LLC,             §
                                   §
                    Defendant.     §
                                   §
FED RESOURCES II, LLC AND FFD      §
VENTURES, LP,                      §
                                   §
   Counterclaim Plaintiffs,        §
                                   §
VS.                                §
                                   §
BANCROFT LIFE & CASUALTY           §
ICC, LTD.,                         §
                                   §
   Counterclaim Defendant.         §

**OPINION AND ORDER**

Pending before the Court in the above referenced cause,
alleging that Defendant/Counterclaim-Plaintiff FFD Resources II,
LLC ("FFD2") defaulted on five loans from Plaintiff/Counterclaim-
Defendant Bancroft Life & Casualty ICC, Ltd. ("Bancroft"), in the
total amount of $1,546,650.00, and that FFD2 misused the collateral
securing the loans, are two inter-related matters:  (1) Bancroft's
objections to United States Magistrate Judge Frances Stacy's
September 19, 2011 order[1] granting FFD2's motion to join FFD

_____

[1] The order is instrument #33.

-1-

Ventures, L.P. ("Ventures") as a Counterclaim-Plaintiff under Federal Rule of Civil Procedure 20 (instrument #35; and (2) Bancroft's motion to dismiss counterclaims[2] (#36).

## I. Bancroft's Objections to Rule 20 Joinder

The Magistrate Judge granted FFD2's motion to join Ventures, not under Federal Rule of Civil Procedure 19, as requested, but under Rule 20[3] on the grounds that Ventures' claims arise out of the same transaction(s) or occurrence(s) as the claims currently in the lawsuit between Bancroft and FFD2 (both claims and counterclaims) and involve common issues of law or fact.

## A. Federal Rule of Civil Procedure 72(a)

After a nondispositive motion regarding a pretrial matter is referred to a magistrate judge for resolution under 28 U.S.C. § 636(b)(1)(A) and after the resulting order is timely appealed, Federal Rule of Civil Procedure 72(a) requires that the district court "in the case must consider timely objections and modify or set aside any part of [the magistrate judge's order] that is clearly erroneous or is contrary to law." To the Magistrate Judge's factual findings the district court applies a clearly erroneous standard and may not disturb the factual findings unless

---

[2] The Counterclaim is #22, pp. 10-15.

[3] This Court presumes that by not addressing FFD2's request for mandatory joinder under Rule 19, the Magistrate Judge implicitly rejected it.

despite the fact that there is evidence to support them, the reviewing court is left with the definite and firm conviction that the magistrate judge has made a mistake. *Benton v. U.S. E.P.A.*, 2012 WL 1037454, *1 (N.D. Tex. Mar. 28, 2012), *citing Smith v. Smith*, 154 F.R.D. 661, 665 (N.D. 1994).  If the Magistrate Judge's "account of the evidence is plausible in light of the record viewed in its entirety," it is not clearly erroneous. *Smith v. Smith*, 154 F.R.D. at 665.  The district court reviews the Magistrate Judge's legal conclusions *de novo*. *Benton*, 2012 WL 1037454, at *1*, citing id.*  Where the Magistrate Judge has properly applied the law to fact findings that are not clearly erroneous, "a vast area of choice" exists in which the magistrate judge's decisions are discretionary and the Magistrate Judge's ruling may only be reversed for abuse of discretion standard. *Id.; Lahr v. Fulbright & Jaworski, L.L.P.*, 164 F.R.D. 204, 208 (N.D. Tex. 1996).  The party appealing/objecting to the order must show how the order is reversible under the applicable standard of review. *Benton*, 2012 WL 1037454, at *1.

**B.  Federal Rules of Civil Procedure 20(a), 19, 21, and 12(b)(7)**

Federal Rule of Civil Procedure 20(a)(1) provides,

> **(a) Persons Who May Join or Be Joined.**
> **(1) Plaintiffs.** Persons my join in one action as plaintiffs if:
>
> **(A)** they assert any right to relief jointly, severally, or in the alternative with respect to or

> arising out of the same transaction,
> occurrence, or series of
> transactions or occurrences; and
> (B) any question of law or fact
> common to all plaintiffs will arise
> in the action.

Both the same transaction and occurrence requirement and the common question of law or fact requirement must be satisfied.  7 Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1683 (3d ed. 2001).  "Rule 20 is merely a procedural device and does not alter the substantive rights of the parties." *Id.* at n.49.

Rule 19(a), addressing "Persons Required to Be Joined if Feasible," provides,

> (1) ***Required Party.***  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> > **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or
>
> > **(B)** that person claims an interest relating to the subject of the action and is so situated that the disposing of the action in the person's absence may:
>
> > > (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> > > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Necessary parties must be joined in an action unless joinder is not

feasible, i.e., the party is not subject to service of process, joinder would divest the court of subject matter jurisdiction, or the joinder would make venue improper. *In re Apple iPhone 3G and 3GS MMS Marketing and Sales Practices Litig.*, MDL No. 2116, ___ F. Supp. 2d ___, 2012 WL 1069169, *3 (E.D. La. Mar. 29, 2012). If the absent party is indispensable and must be joined under Rule 19(a) but cannot be, claims must be dismissed. *August v. Boyd Gaming Corp.*, 135 Fed. App'x 731, 732 (5th Cir. 2005). If the party is not indispensable, the suit can proceed without joinder of the party. *Hood ex rel. Miss. v. City of Memphis, Tenn.*, 570 F.3d 625, 629 (5th Cir. 2009). For the joinder analysis, the Court takes the allegations in the complaint as true. *Indian Harbor Ins. Co. v. KB Lone Star, Inc.*, Civ. A. No. H-11-CV-1846, 2012 WL 1038658, *2 (S.D. Tex. Mar. 27, 2012).

Federal Rule of Civil Procedure 21 states,

> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The Court may also sever any claim against a party.

The district court has broad discretion in deciding whether to sever. *Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000).

Finally, Rule 12(b)(7) permits the court to dismiss a suit for failure to join a required party under Rule 19, which mandates joinder to "all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue" and

"provides for dismissal of litigation that should not proceed in the absence of parties that cannot be joined." *HS Resources, Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003). Thus Rule 19 not only "provides a framework for deciding whether a given person should be joined," but if he should be, "guides the court in deciding whether the suit should be dismissed if that person cannot be joined." *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986).

## C. Bancroft's Objections

Bancroft's objections to the joinder are that its claims against FFD2 are based on a series of loans it made to FFD2, memorialized by the five Promissory Notes signed by FFD2, secured by FFD2's assets, and on which FFD2 defaulted. It contends that Ventures, although the sole member and direct corporate subsidiary of FFD2, has no direct liability on the loans, is not a signatory or a guarantor of the loans, and has no interest in the security, while the Promissory Notes do not permit recourse to any person, entity or asset other than the stated security, i.e., assets owned solely by FFD2.

In contrast, except for one count for declaratory judgment, the eight other counts of the Counterclaims asserted by Ventures, as an insurance "Certificate Holder," against Bancroft, the insurer, relate to matters regarding an insurance policy between Bancroft and Ventures. Although FFD2 is identified as an

"Additional Insured" on the insurance certificates, it is not the certificate holder and has no standing to bring the insurance-based counterclaims.[4]   Bancroft's loan-based claims against FFD2 can be

---

[4] Bancroft does not cite any authority for its statement. The rights of an "additional insured" are governed by the terms and conditions of the insurance policy. *In re Oil Spill by the Oil Rig "Deepwater Horizon in the Gulf of Mexico*, MDL No. 2179, 2011 WL 5547259, *1 (E.D. La. Nov. 15, 2011); *Philadelphia Elec. Co. v. Nationwide Mut. Ins, Co.*, 721 F. Supp. 740, 742 (E.D. Pa. 1989)(The language of the policy, and in particular the language of the Additional Insured endorsement, determines the rights of the additional insured). "Generally, the parties are free to craft coverage for Additional Insureds as they see fit." *Cummings V. Allstate Ins. Co.*, 2011 WL 4528366, *5 (E.D. Pa. Sept. 30, 2011), *citing Meridian Mut. Ins. Co. v. Cont'l Bus. Ctr.*, No. Civ. A. 04-1693, 2005 WL 856935, *7 (D.D. Pa. Apr. 14, 2005)("noting language in different policies creating varying degrees of coverage for Additional Insureds.").

Furthermore, "[b]ecause only the insurer and the named insured are parties to the insurance contract, additional insureds necessarily are third-party beneficiaries.  As a third-party beneficiary, an additional insured has the right to enforce the insurance policy in his favor." Douglas R. Richmond, "The Additional Problems of Additional Insureds," 33 Tort & Ins. L.J. 945, 947 (Summer 1998).  To determine if a third party can enforce a contract the court looks only at the intentions of the contracting parties.  The fact that a third party obtains an incidental benefit is not sufficient to allow him to enforce the contract.  A third-party beneficiary may recover on a contract that was entered into by other parties only if the other parties intended to provide a benefit to the third party and only if the contracting parties entered into the agreement directly for the third party's benefit. *Alvarado v. Lexington Ins. Co.*,___ S.W. 3d ___, Nos. 01-10-00740, 01-10-01150, 2012 WL 1355733, *5 (Tex. App.--Houston [1st Dist.] Apr. 19, 2012)(citations omitted).  *See also Tawes v. Barnes*, 340 S.W. 3d 419, 425 (Tex. 2011)("[I]n the absence of a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication.").  *In accord, In re El Paso Refinery, LP*, 302 F.3d 343, 353-54 (5th Cir. 2002).

Ventures and FFD2, who bear the burden of establishing that they suffered a lost as a result of the alleged breach of contract to establish standing,  have not identified any language

resolved without Ventures' participation, as can Ventures' insurance-based claims against Bancroft without the participation of FFD2.

Bancroft insists that the Magistrate Judge's order rests on the incorrect legal conclusion that a party can assert claims belonging exclusively to a non-party (here, allowing FFD2 to bring the insurance policy claims that belong only to Ventures) and use Rule 20 to join the non-party (Ventures) to the lawsuit. Bancroft maintains that the insurance-based counterclaims in this action are not properly asserted by FFD2, such that they could form a proper foundation to support the joinder of Ventures, and thus the order permitting joinder is contrary to law.

**D. FFD2 and Ventures' Response (#37)**

Contending that the Magistrate Judge's ruling was correct, FFD2 and Ventures point to other cases pending in different courts involving Bancroft and other FFD entities, with essentially identical facts, circumstances, and counterclaims, and that those courts have permitted joinder of Ventures: *Bancroft Life & Cas. ICC, Ltd. v. FED Resources IV, LLC*, Civ. A. No. 3:11-CV-00214 (D.

_____

in the insurance policy that would support FFD2's claim to standing to assert the breach of insurance policy claims brought by Ventures against Bancroft, no less the scope of FFD2's rights generally. *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 465 (5th Cir. 2003). Nor have the parties addressed FFD2's possible status as a third-party beneficiary of the insurance policy. What is clear is that the forum selection clause applies to claims arising from or related to the insurance policy.

Nev. Sept. 29, 2011)(copy of docket sheet with minute entry granting joinder (but not identifying the Rule nor its reasoning, though the motion, like the one in the instant case, was brought under Rule 19) attached as Ex. A, entry #41); and *Bancroft Life & Cas. ICC, Ltd. v. Richard D. Clay*,[5] Civ. A. No. 1:11cv01505-SCJ (N.D. Ga. Oct. 6, 2011)(order granting Rule 20 joinder attached as Ex. B).[6]   FFD2 and Ventures emphasize that under Bancroft's practice, insured entities like FFD2 and Ventures would pay an insurance premium to Bancroft, and Bancroft would then "loan back" 70% of the premium amount to that insured.   #22, FFD Counterclaims ¶ 31.  Here  Ventures and its affiliated entities, including FFD2, paid their premiums to Bancroft, Bancroft then made the loans at issue to FFD2, and  Bancroft billed Ventures for interest on those loans.  (FFD Counterclaims ¶ 5-12, 31-34, 58; Exhibit D to Counterclaims).  They further emphasize that FFD2's claims and defenses regarding the Notes are bound up in the insurance product

---

[5] Richard Clay is purportedly an individual with an ownership interest in the FFD entities and a guarantor of a loan from Bancroft to an affiliated FFD entity.

[6] This Court observes that yet another nearly identical case against another FFD entity is pending in this district before the Honorable Ewing Werlein, Jr., in which Ventures was joined by FFD3 as a Counter-Plaintiff with FFD3 without requesting leave of court to do so:  *Bancroft Life & Casualty Co. ICC, Ltd. v. FFD Resources III, LLC, et al.*, H-11-2382.  Judge Werlein recently dismissed without prejudice all counterclaims arising out of or relating to the insurance policy for improper venue under the forum selection clause.  2012 WL 2368302 (S.D. Tex. June 21, 2012).

that Bancroft issued to Ventures and that FFD2 is listed on the relevant Certificates of Insurance as an "additional insured" on the policy (Ex. A to Counterclaims).

In essence they argue that the Court must examine the counterclaims to understand how their right to relief arises from the same transactions and/or occurrences as Bancroft's and implicates common questions of law or fact.

The Court therefore summarizes the allegations of the Complaint and the Counterclaims.

## E.  Allegations of Bancroft's Complaint (#1)

The complaint, filed before the joinder of Ventures, asserts that Bancroft is a licensed insurance company formed under the laws of St. Lucia, West Indies, with its principal place of business there also. FFD2 is a Nevada limited liability company located in Atlanta, Georgia and is in the business of making payday loans. In December 2006, Bancroft loaned its insured, FFD2, a total of $1,546,650.00, memorialized by five Promissory Notes and secured by five Security Agreements collateralized exclusively by FFD2's assets (including equipment, goods, accounts receivable, marketable securities, and cash (the "Collateral")). Exs. A-1, A-2, A-3, A-4, and A-5 (Promissory Notes, stating they are governed by Texas law); Exs. B-1, B-2, B-3, B-4, and B-5 (Security Agreements, also governed by Texas law, each requiring that FFD2 not misuse, abuse or waste the collateral or allow the collateral

to deteriorate beyond the ordinary wear and tear of its intended use or to use the collateral in violation of any statute or ordinance).  After making regular interest payments for years, FFD2 defaulted on the Notes on December 31, 2010 when it failed to make the required payments.  On March 21, 2011, Bancroft notified FFD2 of its default and of Bancroft's intention to accelerate the loan balance, under the provisions of the Notes, and to proceed to exercise its rights against the Collateral.  On April 7, 2011 it did the same, stating that the entire unpaid balance of $1,546,650.00 and the accrued interest through March 31, 2011 of $125,624.69 would be accelerated and would become immediately due and payable on April 10, 2011.  As of April 1, 2011 as provided in the Notes, default interest began to accrue on the outstanding balance at the default rate of 18% per annum.  The Promissory Notes and Security Agreements further provide for payment of Bancroft's costs of collection in the amount of ten percent of the outstanding principal and interest.

Bancroft asserts as causes of action against FFD2 (1) the right to possession of the identified Collateral; (2) breach of contract (to preserve the value of the Collateral securing the debt, to pay certain assessments to preserve the requisite level of insurance reserves, to cure its assessment default, and to not use the Collateral in violation of various state laws), (3) declaratory judgment that FFD2 is in default on the Promissory Notes in the

principal amount of $1,546,650.00, plus accrued interest through
March 31, 2011 in the amount of $125,624.69, plus default interest
at the rate of 18 percent per year from April 1, 2011, plus costs
of collection in the amount equal to ten percent of the unpaid
balance of principal and interest, and a declaration that Bancroft
may proceed to exercise its right against the collateral securing
payment under the Promissory Notes.

**F.   Allegations in FFD2's and Ventures' Counterclaims (#22)**

According to the Counterclaims, commencing in December 2005,
under a Group Insurance Policy, Bancroft insured FFD2 and its
affiliated entities, i.e., Ventures, FFD Resources I, LLC ("FFD1"),
FFD Resources III, LLC ("FFD3"), FFD Resources V, LLC ("FFD5"), and
Richard Clay ("Clay"), one of the individual owners of Ventures,
(collectively, "FFD") against business losses arising from loss of
business license, changes in laws and regulations, costs incurred
to defend actions brought by a governmental entity, losses from
uncollectible loans, and other covered causes of loss.[7]  Bancroft
provided FFD with Certificates of Insurance (Ex. A to #22), stating
the material terms of coverage under the Policy.[8]

---

[7] Clay, on behalf of Ventures, filed the Application for
Insurance.  The Certificates of Insurance issued state that the
"Certificate Holder" is Ventures, while the other FFD entities,
including FFD2, are "Additional Insureds."  They further state
the date and that they are for a one-year term.

[8] The Court would point out that the Certificates actually
state, "The Group Policy sets forth the terms and conditions of
the insurance provided." Exs. A-1 through A-5.

-12-

FFD2 asserts that Bancroft, through its representative and Clay's personal attorney, Mr. Loren Cook, orally and in writing[9] fraudulently induced FFD to purchase Bancroft's "Premium Lite" insurance product, not only with misrepresentations regarding material matters about the insurance coverage, but a representation that the program would also provide a legal tax planning vehicle to allow FFD to defer income across calendar years and thereby smooth and reduce its tax burden.  FFD paid to Bancroft a substantial premium, plus a "Load Fee" equal to 6% of the premium, a "Quarterly Expense Charge" of 1.6% of FFD's premium, and certain underwriting and actuarial fees.  Bancroft represented to FFD that the premium would be deposited into FFD's premium "Reserve Account," would be pooled with the Reserve Accounts of other policy holders, and would be invested in "conservative" investments, such as Treasury Bonds.[10]

---

[9] See, e.g., Ex. N, a sales brochure provided to Clay by Cook discussing benefits of the Premium Lite insurance program.

[10] For example, Cook advised Johnson and Chewning that their money would be invested in T-Bill-like investments.  #22, Ex. B, letter from Bancroft-designated claims administrator Intercontinental Captive Management Company ("ICMC") reporting to "all participating insureds of Bancroft" that "Bancroft has always tried to invest its reserve assets in a conservative fashion, blending cash, mortgage-backed securities and bonds in its investment portfolio."  Instead Bancroft allegedly engaged in risky and self-dealing investment schemes, such as an undisclosed loan to ICMC's G. Thomas Roberts of $250,000 of policyholders' pooled Reserve Account money for a land deal in the Florida Keys that never happened and which Robert then spent for himself. Again without disclosure to FFD, Bancroft also purportedly invested the Reserve money in high-risk securities after the market for them had crashed in 2008.

#22, Ex. B (Letter to Bancroft Insureds from G. Thomas Roberts of ICMC).  Furthermore FFD was told that, as part of the insurance program, FFD could take loans from Bancroft based on the amount of FFD's premium and the Reserve Account.  At the end of the five-year policy period, FFD's Reserve Account would be applied to offset the principal from a loan against the cash value of the premium Reserves, so the transaction would "zero out."

FFD2 contends that Bancroft failed to disclose additional material facts to FFD2 when seeking to induce its enrollment in the insurance program.  For example, Bancroft failed to disclose that Bancroft was not registered in the State of Texas to sell insurance even though it was doing so, that Bancroft's agent and designee, Association Benefits Group, Inc. ("ABG"), was not registered with the Texas Department of Insurance, nor was Bancroft's agent and designee Loren Cook registered as an insurance agent with the Texas Department of Insurance (Exs. P and R).  It also did not reveal that the Risk Analysis and Recommendations for Insurance Coverage by ICMC was inadequate to determine whether the premium was reasonable for the tax deduction the insured would take.  Bancroft also failed to disclose any fees in addition to the 6% Quarterly Assessment, the 1.6% Load Fee, a one-time fee for the Risk Assessment Report produced by ICMC, and fees for "underwriting," allegedly performed by ABG.  In 2008 Bancroft without notice began assessing exorbitant and unfounded fees not disclosed orally or on

the application, e.g., Subrogation Recovery" and "Reserve
Contingencies," totaling more than $656,000.  In 2008-09 Bancroft
assessed $3,005,972.53 in "Retrospective Assessments" without
explaining the basis for the calculation or justifying them, and
presumably wrongfully reduced FFD's Reserve Account accordingly.[11]
Another material nondisclosure was that the principals of the
third-party administrator ICMC, G. Thomas Roberts and Nigel Bailey,
had a history of participation in offshore tax fraud scams and had
been sued by the United States Department of Justice.  Roberts
testified in federal court that this information had been fully
disclosed to Bancroft in 2004, a year before FFD applied for
insurance coverage with Bancroft, but Bancroft did not inform FFD
before allowing ICMC to engage in the Risk Assessment for FFD's
potential coverage or before assessing a $5,000 fee against FFD's
Reserve Account for that report.  Nor did Bancroft disclose that
some individuals enrolled with Bancroft were being audited by the
Internal Revenue Service.

---

[11] Specifically FFD2 charges that on April 8, 2008 Bancroft
assessed a subrogation recovery fee of $989,982.55 and a "reserve
contingency" fee of $159,946.54 against Ventures.  In the fourth
quarter of 2008 Bancroft assessed another subrogation recovery
fee of $7,858.32 and a "reserve contingency" fee of $322,310.27
against Ventures.  In the fourth quarter of 2009 Bancroft
additionally levied an assessment of over $2 million, plus
subrogation recovery fee of $166,804.86 and a "reserve
contingency" fee of $60,455.02 against Ventures. #22 at p. 30.
In the first quarter of 2010 Bancroft assess a fee of $500
against Ventures.  None of the assessments or fees were disclosed
to Venture orally or in its application, nor has Bancroft
explained or supported the basis for these fees.  *Id*. at p. 31.

Bancroft and ABG purportedly treated the different FFD entities interchangeably, including with regard to their participation in the Premium Lite insurance program, payment of the premium, issuance of loans, and invoicing and payment of interest on the loans. Bancroft intermingled the different FFD entities' Reserve Accounts and accepted premium payments from them at different times for their collective coverage under the Bancroft insurance program. #22, Ex. C. Bancroft provided loans to Clay, FFD2, FFD3, and FFD4, but invoiced Ventures for and accepted payments from Ventures on the various loans, including the loans at issue in the instant action, even though Ventures did not take the loans or sign the Promissory Notes. #22, Ex. D (loan interest invoices attached to January 5, 2011 letter to Clay and Ventures from Lili Le of Loren R. Cook & Associates). Not only did Bancroft treat the insured FFD entities interchangeably with regard to insurance coverage and loans connected to premium payments by the different entities even though they had separate identities and operations, but Bancroft understood that its representations to Clay or an FFD entity would be communicated to the others.

FFD2 alleges that instead of investing FFD's Reserve Account conservatively as was promised, Bancroft wasted its funds on undisclosed and highly risky investments and on remittances to G.

Thomas Roberts ("Roberts"),[12] one of the principals of ICMC. [13]

FFD2 further charges that while initially under the insurance program Bancroft paid FFD's claims on FFD's covered business losses under the terms of its Uncollectible Loans coverage, suddenly in 2010 without justification Bancroft started to refuse to do so.  As an example it alleges that on October 25, 2012 FFD submitted a claim for $3,250,885.61, reaching the applicable coverage limit of $3,004,448.00 of insured uncollectible business loans which Bancroft refused to pay, despite FFD's submission of its 99-page collection log as proof of loss, on the grounds that FFD did not adequately document its loss in the signed claim form even though the claim was submitted in the same manner as previous claims. #22, Exs. G, H, I.  On February 14, 2011, Bancroft's counsel, Thompson Hine, in what FFD2 characterizes as a bad faith effort to evade coverage obligations, sent a letter canceling FFD's coverage

---

[12] FFD2 claims that one undisclosed investment was a loan to Roberts for $250,000 from the pooled policyholder Reserve money so he could invest in a land deal in the Florida Keys.  Roberts testified that after the land deal fell through, he just spent the money.  Ex. E (Transcript of Continued Preliminary Injunction, *Bancroft Life & Casualty ICC, Ltd. v. Intercontinental Management Ltd.*, Aug. 19, 2010, W.D. Pa.).  It further asserts that Roberts was sued by the Department of Justice as a prelude to potential criminal indictments in a $500 million tax fraud scheme that led to applications for injunctions, asset freezes, and an agreement by one of the affiliated entities to cease operations.  Thus, FFD2 maintains, Bancroft wasted the Reserve Account money that it had represented would offset the aggregate $1,546,650.00 of the FFD2 loans.

[13] ICMC was later replaced by CBIZ as claims administrator.

"retrospectively back to the initial date benefits were applied for" because FFD had supposedly not paid a $989,982.55 retrospective "assessment" purportedly levied against FFD in 2008 nor paid a premium for 2010, even though the allegedly covered losses were incurred in 2009.  #22, Ex. Y.

FFD2 claims that in total FFD has paid $6,619,120.00 in premiums to Bancroft, but its recent statement states that its Reserve Account has a value of only $2,704,365.20.  FFD2 contends that Bancroft has wrongfully reduced FFD's Reserve Account by its improper investments and assessments of undisclosed and unsupported fees.  Even though Bancroft claims that it terminated FFD's coverage on February 14, 2010, it has not remitted to FFD the value of its Reserve Account as required under the terms of the policy. In all, Bancroft allegedly owes FFD at least $311,917.87 that it wrongfully assessed against FFD's Reserve Account, plus $3,004,448.00 for an insurance claim FFD submitted on October 25, 2010 but that was wrongfully denied.

FFD2 further charges that Bancroft did not disclose the "interlocking ownership and corporate governance it shared with ABG, the 'separate' membership group that prospective policyholders such as FFD were told [they] had to join as a condition of coverage."  #22 at p.24.  According to the Counterclaims, Bradley Barros was and is the President of Bancroft, a Director of Bancroft, and a 50% owner of the trust that owns Bancroft, at the

-18-

same time as he was and is the President of ABG, the sole Director of ABG, and the sole owner of ABG.  Ex. U.  Barros also operated an insurance business, Walters & Barros, from the same address as ABG's address.  #22, Exs. N, V, W.

There are nine counts in the Counterclaims: (1) breach of contract in Bancroft's failure to pay FFD's insurance claim, submitted on October 25, 2010; (2) breach of contract in Bancroft's failure to return unused premium reserves plus investment earnings; (3) conversion in Bancroft's wrongful exercise of dominion and control over property rightfully belonging to FFD, and failure to return the assets in the reserve account without set-off; (4) fraudulent inducement to purchase Bancroft's Premium Lite insurance product; (5) breach of fiduciary duty of care and loyalty by Bancroft, which created a special relationship of trust and confidence as the manager, trustee, escrow holder or other agent charged with overseeing and prudently investing the money FFD entrusted to it; (6) unjust enrichment in holding money and property rightfully belonging to Ventures and FFD; (7) demand for an accounting; (8) alternatively, rescission; and (9) declaratory judgment on the Promissory Notes to define the rights and other legal relations of Bancroft and FFD, i.e., that the loan-back Promissory Notes are not due and owing, that Bancroft has sufficient reserves in its premium account to offset the amounts purportedly due, and that FFD owes no money with respect to the

loan-back promissory notes.

## G.  The two motions are interrelated

Without explanation, the Magistrate Judge allowed permissive joinder of Ventures as a Counterclaim-Plaintiff in this action under Rule 20 even though FFD2 and Ventures requested and argued for mandatory joinder under Rule 19.  She did not address whether joinder was mandatory under Rule 19 nor consider the effect of the mandatory forum selection clause in dispute here (the basis for Bancroft's motion to dismiss) if joinder was mandatory or permissive. *See, e.g.,* Matthew C. Conahan, *De-Frauding the System: Sham Plaintiffs and the Fraudulent Joinder Doctrine*, 110 Mich. L. Rev. 1341, 1357 (May 2012)("A plaintiff subject to a mandatory forum selection clause is estopped from joining a lawsuit outside of the forum.").

Moreover, because the motion for Rule 19 joinder addresses the core dispute in the motion to dismiss counterclaims, i.e., whether the loan (default on the Promissory Notes) dispute is separate from and independent of the insurance policy dispute, the Court finds it appropriate to consider the two motions together.  If the Promissory Note claims and insurance-based claims are inextricably intertwined, if the forum selection clause is binding on the parties for insurance-based claims, and if Ventures is a necessary party under Rule 19, this action cannot go forward in this Court. If the claims are discrete and do not arise from the same

transaction or occurrence or the joinder of Ventures is permissive, and if the forum selection clause is enforceable, the Magistrate Judge's order of joinder should be overruled and insurance-based claims dismissed without prejudice to being reurged in the proper venue, St. Lucia.

## II.  Plaintiff-Counterclaim Defendant Bancroft's Motion to Dismiss Counterclaims (#36)

Bancroft, using the "FFD" designation for Counterclaim-Plaintiffs (FFD2 and Ventures) collectively, first argues that the insurance-based counterclaim counts (1-8) should be dismissed for improper venue based on the parties' forum selection agreement[14] specifying that disputes relating to the insurance policy could be brought only in St. Lucia.  The ninth count, for declaration of Bancroft's and FFD's rights and obligations under both the insurance agreement and the Bancroft-FFD2 Promissory Notes, should also be dismissed because there is no actual controversy regarding those rights and obligations.

Bancroft argues that the Group Policy[15] in dispute, although

---

[14] See Membership Application for Group Benefits, Ex. N to Counterclaims (#22-2) and Certificates of Insurance, Ex. A to #22.

[15] As noted earlier, each of the Certificates of Insurance stated that the "Group Policy sets forth the terms and conditions of the insurance provided."  Moreover it should be noted that it was Ventures that completed the Membership Application for Group Benefits, and upon its approval by Bancroft, the Certificates of Insurance were issued identifying Ventures as the "Certificate Holder."  FFD2 is identified in them as an "Additional Insured."

amended over time, always included a forum selection clause requiring that all actions be brought in Bancroft's place of residence.  Initially (when FFD enrolled in the insurance program) it resided in the British Virgin Islands, but it subsequently moved to St. Lucia, West Indies.  The Membership Application for Group Benefits ("Application")(Ex. N to the Counterclaims) completed by Clay on behalf of Ventures in 2005, represented and warranted in Section 2(e), "The benefits of this coverage may only be enforced within the jurisdiction and under the laws of the British Virgin Islands."  Part G(g) of Exhibit N further provides, "Applicant acknowledges that the Insurer is licensed and admitted in the British Virgin Islands.  The coverage cannot be offered in the United States.  The benefits of this coverage may only be enforced within the jurisdiction and under the laws of the British Virgin Islands."

Each Certificate of Insurance (Ex. A to Counterclaims, #22) issued before 2009 stated,

> This Certificate of Insurance confirms that the Certificate Holder named below has Business Income and Risk insurance coverage under a Group Policy issued to Fidelity Capital Management Ltd.  The Group Policy sets for the terms and conditions of the insurance provided. The Group Policy may be reviewed at the offices of Fidelity Capital Management Ltd., Nagico Building, 139 Main Street, PO Box 3261, Road Town, Tortola, British Virgin Islands.

---

On these grounds Bancroft contends that because the insurance agreement is between Bancroft and Ventures, FFD2 has no legally cognizable right to relief on the insurance-based Counterclaims.

In 2009 the Certificates (#36, Ex. 1), which were for coverage of a one-year period, were modified to reflect Bancroft's relocation:

> This Certificate of Insurance confirms that the Certificate Holder named below has Business Income and Risk insurance coverage under a Group Policy issued to Sempre Fidelis, Inc.  The Group Policy sets forth the terms and conditions of the insurance provided.  The Group Policy may be reviewed at the offices of Sempre Fidelis, Inc.  A written request to make an appointment to review the Group Policy should be sent to:  Sempre Fidelis, Inc., 46 Micoud Street, P.O. Box 1209, Castries, St. Lucia, West Indies.

The Group Policy, though modified over time, referenced in each Certificate of Insurance, has always included a forum selection clause requiring that all actions be brought in Bancroft's place of residence and organization.   When FFD's insurance coverage commenced, the Group Policy mandated, "Any action at law or in equity must be brought only in the Courts of Tortola, BVI and the law of Tortola, BVI shall be controlling law for all legal, equitable, or administrative purposes and proceeds." #36, Ex.2, § U(4)(2005 Group Policy redacted).   In the 2008 version, Ex. 3 to #36, § U(4) the modified Group Policy provided,

> CONTROLLING LAW AND JURISDICTION:  Any action at law or in equity must be brought only in the Courts of Saint Lucia, West Indies, and the law of Saint Lucia, West Indies shall be controlling law for all legal, equitable, or administrative purposes or proceedings.

Section XXVIII(D) of the 2010 Group Policy, Ex. 4 to #36, recites,

> Any action at law or in equity based upon, arising from, or in any way related to the Policy or any Claim, including, but not limited to, benefits payable under the policy, coverage issues, termination issues and premium refunds (i) must be brought in the Courts of St. Lucia,

-23-

West Indies, which shall have exclusive jurisdiction over
such matters and (ii) the law of St. Lucia, West Indies
shall be the choice of law for all legal, equitable, or
administrative purposes and proceedings arising out of or
related in any manner whatsoever to the Policy or any
Claim. *This forum selection provision shall not apply to
an action brought by the Company [Bancroft] to enforce
the terms of any loan made by the Company to a
Certificate Holder.* [emphasis added by the Court][16]

The insurance counterclaims asserted here fall under the 2010 Group

Policy.  The Court further notes that the front cover page of the

2010 Group Policy has only Bancroft's name, the new St. Lucia

address, and the title of the policy on its cover page, so this

information in prominent.

Bancroft insists that all the counts of the Counterclaims

concern insurance claims against Bancroft except part of the

declaratory judgment count that relates to issues under the

Promissory Notes; thus the insurance-based counterclaims must be

brought in the St. Lucia forum.

**A.   Standard of Review**

---

[16] This forum selection clause is a mandatory one, clearly
and expressly requiring that all litigation arising from or in
any way related to the insurance policy, specifically including
but not limited to matters relating to benefits payable under the
policy, coverage issues, termination issues and premium refunds,
must be conducted in St. Lucia, and clearly distinguished from
any suit brought by Bancroft to recover on its loans to a
Certificate Holder.  *City of New Orleans v. Mun. Admin. Servs.,
Inc.*, 376 F.3d 501, 504 (5th Cir. 2004)("For a forum selection
clause to be exclusive, it must go beyond establishing that a
particular forum will have jurisdiction and must clearly
demonstrate the parties' intent to make that jurisdiction
exclusive.").

The Fifth Circuit has not decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on a forum-selection clause, but where the parties have not objected to applying Rule 12(b)(3) the Fifth Circuit has reviewed the dispute under 12(b)(3). *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472-73 & n.3 (5th Cir. 2010).

On a motion to dismiss for improper venue under either Rule 12(b)(1) or 12(b)(3), in a *de novo* review the court must take all well pled factual allegations as true and must view all facts in a light most favorable to the plaintiff. *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 448 (5th Cir. 2008); *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237-38 (5th Cir. 2009), *cert. denied sub nom. Ambraco, Inc. v. M/V Clipper Faith*, 130 S. Ct. 1054 (2010). The court may look at evidence in the record beyond the facts alleged in the complaint and its proper attachments. *Ambraco*, 570 F.3d at 238. The court may find a plausible set of facts in the complaint but itself, in the complaint supplemented by undisputed facts evidenced in the record, or in the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Id., citing Murphy v. Schneider Nat'l Inc.*, 362 F.3d 1133, 1138-40 (9th cir. 2004)(holding that, in the absence of factual findings by the district court based on an evidentiary hearing, affidavits and other evidence submitted by the non-moving party in the context of a Rule 12(b)(3)

challenge are to be viewed in the light most favorable to that party).

## B.  Forum Selection Clauses

"Forum selection clauses play an important role in international contracting because they eliminate the 'uncertainty as to the forum for disputes and applicable law [that] 'will almost inevitably exist with respect to any contract touching two or more countries.''" *Braspetro Oil Services Co. v. Modec (USA), Inc.*, 240 Fed. Appx. 612, 615 (5th Cir. 2007), *citing Haynsworth v. The Corporation*, 121 F.3d 956, 962 (5th Cir. 1997), *quoting Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974).

Federal law governs the enforceability of forum selection and choice of law clauses in both diversity and federal question cases. *Haynsworth*, 121 F.3d at 962 (*citing M/S Bremen v. Zapata Off-shore Co.*, 407 U.S. 1 (1972), and *Scherck*, 417 U.S. at 518-21 (1974)), *cert. denied*, 523 U.S. 1071 (1998).  The enforceability of a forum selection clause is a question of law.  *Haynsworth*, 121 F.3d at 961.  Forum selection clauses are generally enforceable and presumed to be valid.  *M/S Bremen v. Zapata Off-shore Co.*, 407 U.S. at 9; *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 537-38 (1995); *In re Laibe Corp.*, 307 S.W. 3d 314, 316 (Tex. 2010). *See generally Phoenix Network Technologies Ltd. v. Neon Systems, Inc.*, 177 S.W. 3d 605 (Tex. App.--Houston [1st Dist.

2005)(discussing Texas law on forum selection clauses).  A party who consents to jurisdiction in a forum selection clause waives any due process claims. *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 590 (1991).  Therefore a party seeking to bar enforcement of a forum selection clause bears a heavy burden of demonstrating that the forum selection clause is unreasonable under the circumstances. *Bremen*, 407 U.S. at 12-13, 15, 18; *Mitsui & Co. (USA), Inc. v. MIRA M/V*, 111 F.3d 33, 35 (5th Cir. 1997); *Haynsworth*, 121 F.3d at 963.

To decide whether a forum selection clause is unreasonable, the court should examine whether "(1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching[17]; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." *Calix-Chacon v. Global Intern. Marine, Inc.,* 493 F.3d 507, 511 (5th Cir. 2007), *citing Haynsworth v. Corporation*, 121 F.3d 956, 963 (5th Cir. 1997), *citing Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991).  "Fraud may invalidate a forum-selection clause, but

---

[17] "Overreaching is that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." *Haynsworth v. Corporation*, 121 F.3d 956, 965 n.17 (5th Cir.1997).

only if the inclusion of that clause, as opposed to the signing of the entire contract, was the product of fraud." *MaxEn Capital, LLC v. Sutherland*, No. H-08-3590, 2009 WL 936895, *7 (S.D. Tex. Apr. 3, 2009), *citing Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974)(a forum selection clause in a contract is not enforceable if "the inclusion of that clause in the contract was the product of fraud."). "The mere allegation of fraudulent conduct does not suspend operation of a forum-selection clause. Rather, the proper inquiry is whether the forum-selection clause is the result of fraud in the inducement of the forum-selection clause itself." *Id., citing Afram Carriers, Inc. v. Moeykens*, 145 F.3d 298, 302 n.3 (5ᵗʰ Cir. 1998)(party claiming fraud must show that the inclusion of forum-selection clause itself, not the entire agreement, was a product of fraud).

In determining the scope of a forum selection clause, the court should examine the language of the parties' contract(s) to determine which causes of action fall within its scope and are governed by it. *Blueskygreenland Environmental Solutions, LLC v. Rentar Environmental Solutions, Inc.*, Civ. A. No. 4:11-cv-1745, 2011 WL 6372847, *4 (S.D. Tex. Dec. 20, 2011), *citing Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216, 222 (5ᵗʰ Cir. 1998)(the court should "look to the language of the parties' contract to determine which causes of action are governed by the forum selection clauses"), and *citing TGI Friday's, Inc. v. Great*

-28-

*Northwest Restaurants*, 652 F. Supp. 2d 750, 759 (N.D. Tex. 2009). "'[T]he scope of a forum selection clause is not limited solely to claims for breach of the contract that contains it.'" *Id.* at *4, *citing MaxEn Capital, LLC v. Sutherland*, No. H-08-3590, 2009 WL 936895, *6 (S.D. Tex. Apr. 3, 2009), *citing Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993). Whether a forum selection clause covers other causes of action depends mainly on how broadly the clause is worded. *MaxEn Capital*, 2009 WL 936895 at *6, *citing Roby*, 996 F.2d at 1361. In an insurance contract, the phrase "arising out of" is usually construed as indicating a causal connection. *Braspetro Oil*, 240 Fed. App'x at 616 (and cases cited therein). Here Ventures alleges fraudulent conduct by Bancroft and its agents in inducing Ventures to apply for and purchase the insurance policy and Bancroft's subsequent breach of the policy and promises.

"'Unless otherwise expressed, a choice of forum clause does not expire upon termination of the contract from which it derives.'" *Id.*, at *5, *quoting VERSAR, Inc. v. Ball*, No. CIV. A. No. 01-1302, 2001 WL 818354, *2 (E.D. Pa. July 12, 2001) and other cases cited therein. Nor does the defendant's breach of the contract render it unenforceable: "otherwise, a party could defeat a validly negotiated forum-selection clause by simply alleging that the nonmoving party breached the contract, rendering the clause wholly superfluous." *Id.*

**C.  Bancroft's Arguments in its Motion to Dismiss Counterclaims**

Bancroft points out that while the Counterclaims allege that the insurance contract was induced by fraud, FFD fails to allege that the forum selection clause itself was induced by fraud or coercion.  Thus the Counterclaims fail to overcome the clause's presumptive validity.  This Court agrees.  *MaxEn Capital, LLC v. Sutherland*, 2009 WL 936895, at *7, *citing Scherk v. Alberto-Culver Co.*, 417 U.S. at 519.

Bancroft also argues that the allegation that FFD was never provided with a copy of the  Group Policy (#22, Counterclaims, ¶ 41) does not affect the enforceability of the forum selection clause in that Policy.  *In re Int'l Profit Assocs.*, 286 S.W. 3d 921, 924 (Tex. 2009)("simply being unaware of a forum selection clause does not make it invalid").

Furthermore, argues Bancroft, the doctrine of direct benefit estoppel precludes FFD from embracing the benefits of the Group Policy (seeking and obtaining insurance coverage under the Policy and suing on its alleged breach) while repudiating those terms that it does not like.  *See Noble Drilling*, 620 F.3d at 473; *Hellenic Investment Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517-18 (5th Cir. 2006).  The Certificates of Insurance expressly refer to the Group Policy, so FFD was on notice of it and of the fact that the terms and conditions of insurance coverage were governed by the Group Policy.  That FFD sought and obtained direct benefits under

that Policy binds FFD to the Group Policy's forum selection clause. *See In re Kellogg Brown & Root*, 166 S.W. 3d 732, 739 (Tex. 2005)("Under 'direct benefits estoppel,' a nonsignatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as an obligation to arbitrate disputes."); *Hellenic Inv. Fund*, 464 F.3d at 517 (binding a nonsignatory to a forum selection clause under a direct benefits estoppel theory).

Nor does the selection of St. Lucia as the forum, an island in the Carribean whose official language is English, with an independent judiciary, a legal system based on English common law, and rights to appeal, cause sufficient difficulty and or inconvenience as to deprive FFD of its day in court. *See Robert Kwok & Assocs., Ltd. v. Bancroft Life & Casualty ICC, Ltd., et al.*, Cause No. 2011-25680 ("Kwok action"), Order granting Defendant Bancroft's motion to dismiss based on forum selection clause (August 29, 2011 Tex. Dist. Ct. 281st Jud. Dist.), copy attached as Exhibit 7.[18]  The United States District Court for the Central District of California also deferred to the selection of a St. Lucia forum, although under a different form of agreement. *Sea Czar, Inc. V. Bancroft & Casualty ICC Ltd.*, Case No. 8:11-cv-00068

---

[18] Bancroft also attaches copies of Kwok's Amended Petition (Ex. 8), Kwok's opposition (Ex. 10), Bancroft's reply (#11), Kwok's supplemental briefs in opposition (Exs. 12 and 13), and Bancroft's supplemental memorandum (Ex. 14).

(C.D. Cal. May 5, 2011)(copy attached as Ex. 15),[19] *adopted,*
*Bancroft Life & Casualty ICC, Ltd. v. Scolari*, Case No. 3:11-cv-
5017 (W.D. Wash. July 5, 2011)(dismissing counterclaims against
Bancroft).  Bancroft argues that because FFD cannot assert that any
statute bars enforcement of the forum selection clauses, the public
interest does not prevent enforcement of their claims.  *In re
Profit Associates*, 274 S.W. 3d at 680 ("In regard to the public
interest and forum selection clauses, we have held that policy
considerations weigh in favor of enforcing valid forum-selection
clauses absent a statute that requires suit to be brought or
maintained in Texas.").

     Finally Bancroft maintains that there is no actual controversy
concerning Ventures' rights or obligations on the Bancroft-FFD2
Promissory Notes sufficient to support count 9, Ventures'
declaratory judgment counterclaim.  28 U.S.C. § 2201(a)(consistent
with the "cases and controversies" requirement of Article III of
the United States Constitution, the Declaratory Judgment Act
provides that a declaratory judgment may only be issued in the case
of an "actual controversy.").  Moreover the required controversy
must be ripe, not merely speculative.  *Atlantic Cas. Ins. Co. v.*

---

     [19] FFD distinguishes *Sea Czar* by arguing it involved a
different kind of agreement and different form of transaction
than the insurance policy and Promissory Notes here, while the
party enforcing the forum selection clause both saw and signed
the agreement containing it, was aware of the clause, and had an
opportunity to negotiate it.

*Ramirez*, 651 F. Supp. 2d 669, 673 (N.D. Tex. 2009). The only parties to the Notes are Bancroft and FFD2; Ventures is not a signatory to, nor a guarantor of, the Notes and has no interest in the Collateral that secures the Notes. Ventures has no direct liability on the Notes, and the Notes do not allow recourse to any person, entity or asset other than FFD2's Collateral. Thus Count Nine should be dismissed.

**D.  FFD's Opposition (#42) to the Motion to Dismiss**

FFD argues that the five Notes in dispute did not arise in a vacuum, but were inextricably tied into the insurance program in which Bancroft fraudulently induced FFD2 and Ventures to participate. The loans were made to FFD2 as part of a "loan back" of premium funds contributed by Ventures and FFD2 to Bancroft's Premium Lite insurance program. Specifically FFD points out that between December 15 and December 28, 2006, FFD2 wired $2,209.50 in premium payments to ABG. During that same period, Bancroft issued the five Promissory Notes (for a total amount of $1,546,650), loaning back to FFD exactly 70% of the amount of premium paid into the insurance program. These funds were to be placed in FFD's Reserve Account.

FFD contends that the forum selection clause does not apply because (1) it was never incorporated into the parties' agreement so they never agreed to it; (2) Bancroft waived its right to enforce the St. Lucia forum selection clause by bringing suit

against FFD2 in this Court; and (3) the forum selection clause is unreasonable.  While agreeing that Ventures has no duty to pay on the Notes, FFD maintains that the Declaratory Judgment count 9 should not be dismissed as to Ventures because an actual controversy exists regarding Ventures' rights and Bancroft's obligations under the insurance program through which Bancroft issued the Notes to FFD2 and billed Ventures for the interest on those notes.  Finally FFD insists that FFD2 does have standing to assert claims relating to the insurance program because the facts show that it was insured under the program through which Bancroft issued the Promissory Notes that Bancroft is trying to collect against FFD2.

FFD argues that Bancroft ignores the facts, largely summarized above, alleged throughout the Counterclaims showing that FFD2 was insured under the insurance program.  FFD is a closely held group of businesses, and therefore a representation to any one is a representation to all.  FFD further claims that the St. Lucia forum selection clause was never shown to FFD representatives, that FFD was never apprised of any forum selection clause choosing St. Lucia, and that it was not informed that the clause was amended in 2008 and 2010, nor was it informed of Bancroft's move to St. Lucia other than receiving the 2009 Certificates of Insurance with that address on them.  Nor were the 2005, 2008, and 2010 Group Policies, of which only heavily redacted versions are submitted by Bancroft

here, ever seen by FFD.

Moreover throughout the relationship FFD submitted five separate insurance claims for business losses to Bancroft (in 2006, 2007, and 2009), all of which were paid by Bancroft.  One of these claims was returned by Bancroft to be applied to a loan.  Ex. X to Counterclaims.  On October 25, 2010 FFD submitted the claim for $3,250,885.61 which Bancroft wrongfully denied.

Regarding FFD's first argument, that the forum selection clause was never incorporated into the Membership Application for Group Benefits, which was the only document bearing FFD's signature, nor into the Certificates of Insurance, the only insurance document FFD received, FFD contends that a forum selection clause outside of the parties' agreement is only enforceable if the parties' agreement effectively incorporates it. *Valero Mktg. & Supply Co. v. Baldwin Contracting Co.*, No. Civ. A. H-09-2957, 2010 WL 1068105, *2 (S.D. Tex. 2010)(where parties signed one document but the forum selection clause at issue was in another document that the defendant never saw or signed, the court "first must determine whether Defendant agreed to the clause before considering whether it is *enforceable*)(emphasis in original).  As noted *supra*, the Promissory Notes and the Security Agreements state they are governed by Texas law.  In *Valero Mktg.*, also under Texas law, the court concluded that the forum selection clause was part of the parties' agreement only if the document they signed

effectively incorporated it. *Id.* at *4. The court observed that
under Texas law, "an unsigned paper may be incorporated by
reference in a paper signed by the person sought to be charged.
The language used is not important provided the document signed .
. . plainly refers to another writing." *Id., citing In re
Prudential Ins. Co. of America*, 148 S.W. 3d 124, 135 (Tex. 2004).
"Merely referencing another document, however, does not incorporate
the *entire* document when the language used in the incorporation
clause does not indicate the parties' intent to do so. *Id.* In
*Valero Mktg.*, the court found that the language in the parties'
agreement only incorporated the other document for a limited
purpose, which did not include the forum selection clause, and
therefore it was unenforceable as to the defendant that had never
agreed to the clause. *Id.* at *5.

In the instant action the only document signed by an FFD
representative with a disclosure of forum selection was the
Application, on a Bancroft letterhead with the British Virgin
Islands address. Ex. 9 to Counterclaim. The Application stated,
"The benefits of this coverage may only be enforced within the
jurisdiction and under the laws of the British Virgin Islands."
*Id.* § 2(e), § 3(G)(g). The 2005 Group Policy (Ex. 2 to Motion to
Dismiss) contained the forum selection clause putting jurisdiction
in the British Virgin Islands. Bancroft does not dispute that FFD
was never shown the Group Policy or that an FFD representative

never signed the Group Policy.   The Application and the
Certificates of Insurance sent to FFD do reference the Group
Policy.  Because the only forum selection clause ever disclosed to
FFD provided for the British Virgin Islands as the selected forum,
FFD never agreed to a St. Lucia forum selection clause and thus it
is not enforceable against FFD.

In addition FFD maintains that Bancroft waived its right to
enforce the St. Lucia forum selection clause by suing FFD here in
Texas.  Although Bancroft argues that the policy transaction is
completely separate from the loan transaction, the language of the
2010 Group Policy broadly provides, "Any action at law or in equity
**based upon, arising from, or in any way related to the Policy** or
any Claim, including, but not limited to, benefits payable under
the policy, coverage issues and premium refunds must be brought in
the Courts of St. Lucia."  2010 Group Police § XXVIII(D), Ex. 4 to
Bancroft's motion to dismiss).  *See Nauru Phosphate Royalties, Inc.
v. Drago Daic Interests, Inc.*, 138 F.3d 160, 165 (5th Cir. 1998)(in
a case involving "inextricably intertwined" agreements and set offs
against a Promissory Note, stating that when parties' arbitration
clause uses the phrase "arising out of or in connection with or
relating to" and agreement, they "intend the clause to reach all
aspects of the relationship"); *Prima Paint Corp. v. Flood & Conklin
Mfg. Co.*, 388 U.S. 395, 398 (1967)(recognizing as "broad" a clause
requiring arbitration of "[a]ny controversy or claim arising out of

or relating to" the agreement).  FFD insists the Promissory Notes are inextricably tied to the insurance policy because the loans were made to FFD2 as part of a "loan back" of premium funds contributed by FFD Ventures and FFD2 to Bancroft's Premium Lite insurance program.

FFD further contends that FFD2's counterclaims are compulsory and must brought in the Texas forum chosen by Bancroft.  A counterclaim is compulsory under Rule 13(a) if it (1) arises out of the transaction or occurrence that is the subject matter or the opposing party's claim and (2) does not require adding another party over whom the court cannot acquire jurisdiction.  The Fifth Circuit asks four questions to determine whether a claim is compulsory:  (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2)whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim.  *Tank Insulation Int'l v. Insultherm, Inc.*, 104 F.3d 83, 85-86 (5th Cir. 1997).  The counterclaim is compulsory if the answer to any of the four questions is yes.  If a counterclaim is compulsory, there is no need for an independent basis of jurisdiction.  *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 291 (5th Cir.

-38-

1989)("compulsory counterclaims fall within the court's ancillary jurisdiction and do not require an independent jurisdictional basis"); *Zurn Ind. Inc. v. Acton Constr. Co.*, 847 F.2d 234, 237 (5th Cir. 1988)(same).   It is established law that failure to plead a compulsory counterclaim bars that party from bringing a later independent action on that claim.   *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 882 (5th Cir. 1998), *citing Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974).

Next FFD contends that even if the Court concludes that the forum selection clause was incorporated into the parties' agreement and that Bancroft had not waived its right to enforce it, the clause should not be enforced because it is unreasonable.   The clause was the product of fraud or overreaching because it was purportedly in a document never shown or agreed to by FFD. Bancroft unilaterally changed the forum from British Virgin Islands to St. Lucia in the Group Policy, and FFD had no notice of this change nor a meaningful opportunity to agree to or reject the new forum, while circumstances show that Bancroft had a bad faith motive in surreptitiously rewriting the contract and choosing a foreign form to discourage its American insureds from pursuing legitimate claims.   Moreover the forum is a remote alien forum that is seriously inconvenient in terms of expense, time spent traveling, and securing local counsel.

Furthermore, argues FFD, the cases on which Bancroft relied to

argue that the direct benefit estoppel doctrine bars FFD from arguing that it was never provided with a copy of the Group Policy and that it never signed that Group Policy do not involve the same secret post hoc change in fora that occurred here.  As an insured, FFD clearly has a right to the benefits of its insurance policy.

FFD adds that the forum selection clause is also unreasonable because litigating in St. Lucia would deprive FFD of its day in court since, unlike the British Virgin Islands and the United States, St. Lucia does not recognize a right to a jury trial in civil cases.

FFD also argues that the forum selection clause here is unreasonable because it violates the public policy of the state of Texas.  As stated in the Texas Insurance Code § 101.001,

> (a)  It is a state concern that many residents of this state hold insurance policies issued by persons or insurers who are not authorized to do insurance business in this state and who are not qualified as eligible surplus lines insurers under Chapter 981.  These residents face often insurmountable obstacles in asserting legal rights under the policies in foreign forums under unfamiliar laws and rules of practice . . . .
>
> (b) The purpose of this chapter is to subject certain insurers and persons to the jurisdiction of . . . the courts of this state in suits by or on behalf of the state or an insured or beneficiary under an insurance contract.

Bancroft failed to disclose to FFD that it was not registered to conduct the business of insurance in Texas, or that its agent and designee ABG was not registered with the Texas Department of

Insurance, nor that Cook was not a registered insurance agent, yet Bancroft asks the Court to enforce a clause that would trigger these public policy concerns.

FFD in addition argues that the Declaratory Judgment count is valid and should not be dismissed because Venture's rights and Bancroft's duties under the insurance program, of which the Notes are a part, are in controversy and are tied together through the parties' course of dealing, detailed in the factual allegations summarized above, more than sufficient to satisfy standards under Rule 12(b)(6). FFD2 as an "additional insured" is entitled to the same coverage as the named insured, Certificate Holder Ventures, *See, e.g., Travelers Prop. Cas. Co. v. Liberty Mut. Ins. Co.*, 444 F.3d 217, 219 (4th Cir. 2006)(recognizing that an insurer owes to an additional insured under the policy an independent contractual obligation to provide coverage); *Wyner v. N. Am. Specialty Ins. Co.*, 78 F.3d 752, 756 (1st Cir. 1996)("The purpose of provisions to add insureds is to extend the policy coverage to others . . . not to change the nature of the coverage)(internal citations and quotations omitted); *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 314 (5th Cir. 1978)(recognizing that additional insureds are entitled to the same protections as the named insured). Therefore in addition to Ventures, FFD2 also has a claim for a return of premiums. Although FFD2 was not a signatory to the Membership Application, the Application included

-41-

an Exhibit (Ex. N to Counterclaims at 4) that listed additional insured companies and the Certificates of Insurance reflect that FFD2 is an "additional insured."

### Court's Decision

I. Is joinder of Ventures here proper?

The Court agrees with Bancroft that joinder of Ventures was not necessary under Rule 19(a) because, based on the allegations in the complaint, complete relief on the Promissory Notes claim can clearly be accorded between Bancroft and FFD2 based on the default on the five Promissory Notes signed by FFD2, without the presence of Ventures.  The loan dispute and the insurance dispute involve different parties, different transactions, and different time periods.  FFD2, alone, signed the Notes, which were secured exclusively by FFD2's assets, in which Ventures had no interest. In event of default the Notes expressly provide for Bancroft's recourse solely to FFD2's Collateral.  Ventures is not a party to the Notes, was not a signatory to, nor a guarantor of, the Notes, has no alleged interest in the Collateral (assets of FFD2), and has no direct legal liability arising from the Notes.  Bancroft's billing Ventures for interest on the loans covered by the Notes or Venture's payment of such bills did not change the legal liabilities of the FFD2 and Ventures on the Notes.  FFD2 and Ventures are separate entities and there has been no allegation of an alter ego relationship between FFD2 and Ventures to warrant

ignoring the distinctions between the two entities and piercing the corporate veil.  Moreover the Notes do not mention Ventures nor any Certificate of Insurance involved in the insurance dispute.  Any indirect interest that Ventures might have in the Notes is fully protected by FFD2 in this action  Nor will any judgment on the Notes bar Ventures from asserting its insurance-based claims against Bancroft in a separate lawsuit (in St. Lucia) nor any claims it might have relating to the interest that it paid on the Notes on behalf of FFD2.

Nor is permissive joinder under Rule 20 appropriate because FFD2 and Ventures' claims do not arise out of the same transactions and occurrences nor share common questions of law[20] or fact.  It is undisputed that FFD2 signed the Promissory Notes in December 2006 and interests payments were made on the Notes up until December 31, 2010.

In contrast, the first eight counterclaims revolve around (1) Ventures' application for Group Insurance, the misrepresentations made to Ventures to induce it to purchase the insurance, the Certificates of Insurance Ventures received as the Insured and Certificate Holder from Bancroft starting in 2005; (2) the insurance claim Ventures made on October 25, 2010, which Bancroft

---

[20] As indicated, the Promissory Notes and Security Agreements expressly state they are governed by Texas law, while the forum selection clause in the 2010 Group Policy requires application of the law of St. Lucia.

denied; (3) the cancellation of the policy by Bancroft in February 2011; (4) and Bancroft's continuing retention of the reserves that Ventures claims should have been returned to it.  Nothing in the Notes gives FFD2 the right to a set-off of the reserves in the premium account (on the last claim) nor evidences any connection between the loan and Bancroft's insurance program.

The Court agrees with Bancroft that FFD2 and Ventures blur the counterclaims together, failing to clarify that the counterclaims do not belong to both of them.  Other than count 9 for declaratory judgment, the counterclaims are all insurance-based claims that belong to Ventures.  FFD2 has not identified terms in the insurance policy nor alleged facts showing that as an Additional Insured of third-party beneficiary it has standing to assert these counterclaims.  Moreover while Count 9 for a declaratory judgment relating to the Promissory Notes belongs solely to FFD2, count 9 is merely repetitive of FFD2's answer (#22) to Bancroft's complaint, denying liability under the Notes, and is thus  stricken by the Court under Federal Rule of Civil Procedure 12(f).[21]

Therefore, the Court overrules the Magistrate Judge's order granting permissive joinder of Ventures under Rule 20 and dismisses without prejudice Counts 1-8 of the Counterclaims which are subject to the St. Lucia forum selection clause.  The Court also dismisses

---

[21] Rule 12(f) provides in relevant part, "The court may strike from a pleading an insufficient defense or any redundant . . . matter.  The court may act . . . on its own."

count 9 under Rule 12(f).

II.   Is the St. Lucia forum selection clause binding on FFD2 and Ventures?

FFD2 and Ventures claim they are not bound by the St. Lucia forum selection clause because the only document that they received and read was the original Certificate of Insurance (#22-1, Ex. A, dated December 30, 2005).  They argue that not only did they not negotiate and agree to the St. Lucia forum clause, but that the 2010 Group Policy did not properly incorporate it.  Even if it had been properly incorporated, they maintain that Bancroft waived it by filing this action in Texas rather than in the selected forum, St. Lucia.

The Court finds these arguments lack merit.  First, with regard to agreeing to the forum selection clause, Clay, on behalf of Ventures signed and initialed every page of the Membership Application for insurance coverage.  The application states in relevant parts as follows.

> Applicant hereby represents that it has read and understands all the terms set forth in the Application and it is relying solely on the information contained in the Application.  Applicant must accept all terms set forth in the Application. . . . Applicant represents that it reviewed this information and consulted with his or her attorney, CPA, or other appropriate tax, business or financial advisor . . . . Applicant further acknowledges that he or she is a sophisticated person with a substantial net worth in excess of USD $1,000,000.

Ex. N to 22-2 at p. 35.  The application "becomes effective only upon acceptance and approval of this Application by the Association

[here ABG] and the Insurer.  Upon such acceptance the Certificate of Insurance will bear the effective Date as set forth on page one." *Id.* at p. 35 and 43.  The application's forum selection clause clearly states under Section 2, "Representations and Warranties," that the applicant understands that "[t]he benefits of this coverage may only be enforced within the jurisdiction and under the laws of the British Virgin Islands," where Bancroft resided at the time *Id.* at p. 43.  Moreover although the policy could be renewed annually for five years if the Certificate Holder does not elect to terminate it earlier,[22] under "Commonly Asked Questions," the application states that "[t]he underwriting process will define and quantify the insured risks and will result in a Certificate of Insurance for each risk that is covered.  Each year, a new Certificate of Insurance will be provided with updated terms." *Id.* at p. 47, 48.  The first Certificate of Insurance (Ex. A to #22-1), dated December 30, 2006, sent to Ventures constituted acceptance of the application and provided, "The Group Policy sets out the terms and conditions of the Insurance provided.  The Group Policy may be reviewed at the offices of Fidelity Capital Management Ltd. in the British Virgin Islands" whose address is included.

Certificate Holder Ventures and Additional Insured FFD2, in

---

[22] "Premium Return Benefit" section of the Membership Application, Ex. N to #22-1 at p. 2.

knowingly choosing to apply to purchase insurance which was not available in the United States from an off-shore, Carribean company,[23] were thus both given actual notice that the Certificate of Insurance would be issued annually and that it might contain amended ("updated") information, and therefore constructive notice that the actual terms and conditions of the insurance contract would be stated in the Group Policy, which in turn could be reviewed at the address provided in the relevant Certificate of Insurance.

*Black's Law Dictionary* (6th ed. 1990) defines "incorporation by reference" as "[t]he method of making one document of any kind become a part of another separate document by referring to the former in the latter, and declaring that the former shall be taken and considered as part of the latter the same as if it were fully set out therein."  Although Ventures and FFD2 complain that they never knew about the amended residence address of Bancroft nor the modification of the forum selection clause to name St. Lucia as the exclusive forum for disputes arising out of or related to the insurance policy, "[c]onstructive notice is usually applied when a person knows where to find the relevant information but failed to

_____

[23] The Membership Application, Section 2, #22-2 at p. 35, states, "The Insurer is licensed under the provisions of the Insurance Act of the British Virgin Islands to provide general insurance.  The insurance cannot be directly purchased in the United States. . . . The benefits of this coverage may only be enforced with the jurisdiction and under the laws of the British Virgin Islands."

seek it out." *Little v. Smith*, 943 S.W. 2d 414, 421 (Tex. 1997), *citing Champlain Oil & Refining Co. v. Chastain*, 403 S.W. 2d 376, 388 (Tex. 1965)("*Means of knowledge* with the duty of using them are in equity equivalent to knowledge itself."). In *Champlain Oil*, the Texas Supreme Court, opining that "imputed notice carries with it the same legal consequences as conscious knowledge," quoted *Hexter v. Pratt*, 10 S.W. 2d 692, 693 (Tex. Com. App. 1928),

> "Notice in law is of two kinds--actual and constructive. . . . In common parlance, 'actual notice' generally consists in express information of a fact, but in law the term is much more comprehensive. In law whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge itself. . . . So that, in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed.

*Champlain*, 403 S.W. 2d at 388-89. The Court finds that Ventures and FFD2 had constructive notice to review the annual Certificates of Insurance, which would have directed them to Bancroft's changed residence and 2010 Group Policy with its superseding forum selection clause, under which their claims fall. *See also TIG Insurance Company v. Sedgewick James of Washington*, 184 F. Supp. 2d 591, 598 (S.D. Tex. Jan. 26, 2001), in which the plaintiffs argued that they had never received a copy of the insurance policy and relied on the certificate of insurance. Judge Nancy Atlas opined, "Plaintiffs have cited no Texas authority for the proposition that

one may reasonably rely on the text of the certificate of insurance in lieu of the policy language, nor is the Court aware of such authority.  She cited cases holding that the insurance coverage is defined by the policy, not the certificate of insurance and found they "support the practical result that the holder of a certificate of insurance should obtain the insurance policy to ascertain his coverage." *Id.* at 597-98.

Moreover, Ventures and FF2 do not argue that Bancroft prevented them from seeing the policy nor that they made any effort to pursue the method set out in the Certificates of Insurance and were denied access. *Bancroft*, 2012 WL 2368302 at *3.  "Failure to read a policy does not excuse a party from its conditions and other provisions." *Id.* , *citing Shindler v. Mid-Continent Life Ins. Co.*, 768 S.W. 2d 331, 334 (Tex. App.--Houston [14th Dist.] 1989, no writ)("An insured will be deemed to know the contents of the contract he makes.").

Ventures' and FFD2's waiver argument also fails.  As noted *supra*, Section XXVIII(D) of the 2010 Group Policy, Ex. 4 to #36, sets out the St. Lucia forum selection clause and clearly and unambiguously adds in a final sentence, "This forum selection provision shall not apply to an action brought by the Company [Bancroft] to enforce the terms of any loan made by the Company to a Certificate Holder."  This sentence not only adds another distinction supporting the intended independence of loan claims and

insurance policy claims, but also indicates that loan claims are not within the scope of or subject to the forum selection clause. As noted, the Promissory Notes and their related Security Agreements have selected Texas law to apply to the loan claims, while St. Lucia law governs insurance policy disputes.

II. Is the forum selection clause enforceable?

As noted, given the presumptive validity of forum selection clauses, the parties seeking to prevent enforcement, here FFD2 and Ventures, bear a heavy burden of demonstrating that the forum selection clause is unreasonable under the circumstances. *Bremen*, 407 U.S. at 12-13, 15, 18; *Mitsui & Co. (USA), Inc. v. MIRA M/V*, 111 F.3d at 35. The court should examine whether "(1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching[24]; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." *Calix-Chacon v. Global Intern. Marine, Inc.*, 493 F.3d 507, 511 (5th Cir. 2007), *citing Haynsworth v. Corporation*,

---

[24] "Overreaching is that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." *Haynsworth v. Corporation*, 121 F.3d 956, 965 n.17 (5th Cir. 1997)

121 F.3d 956, 963 (5th Cir. 1997), *citing Carnival Cruise Lines v. Shute*, 499 U.S. 585, 595 (1991).   The enforcement of a forum selection clause is an issue of law.   *McPhail v. Oceaneering Int'l, Inc.*, 302 F.3d 274, 278 (5th Cir. 2002); *Calix-Chacon*, 493 F.3d at 510.

Although Ventures and FFD2 appear to have met the standard under Rule 12(b)(6) and Rule 9(b) for stating a counterclaim for fraudulent inducement in getting Ventures to purchase the Group Insurance Policy, they have not alleged nor presented facts showing that the forum selection clause itself was induced by fraud, as required by law.   In *Haynsworth v. The Corporation*, 121 F.3d 956 (5th Cir. 1997), *cert. denied sub nom. Haynsworth v. Lloyd's of London*, 523 U.S. 1072(1998), the   plaintiffs alleged fraudulent acts occurring before the parties entered into the agreement with the forum selection clause to lure them into agreeing to the forum selection clause.   Rejecting this argument, the panel held that any misrepresentations related to the insurance agreement as a whole and that "fraud . . . must be specific to a forum selection clause . . . to invalidate it. . . ."   *Id.* at 963-64.   This Court finds the same true of the counterclaims asserted here.

Moreover, the Fifth Circuit, relying on *Black's Law Dictionary* at 1104 (6th ed. 1990), defined "overreaching" as "that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on

the part of one of the parties." *Haynsworth*, 121 F.3d at 965 & n.17.  Not only did Ventures fill out the Membership Application warranting that it was a sophisticated party, but neither Venture nor FFD2 has argued that to the contrary.  Nor have they alleged facts demonstrating overreaching.

FFD2 and Ventures contend they will be deprived of their day in court by the distance and inconvenience of traveling to St. Lucia.  In this day of advanced technology and readily accessible air travel, the remoteness of a Carribean forum in St. Lucia is not sufficient to render the forum selection clause fundamentally unfair.  *Bancroft*, 2012 WL 2368302 at * ("[T]he necessity of traveling to a remote forum does not preclude the enforcement of a forum selection clause."), *citing Pugh v. Arrow Electronics,* Inc., 304 F. Supp. 2d 890, 895 (N.D. 2003), *in turn citing Carron v. Holland*, 51 F. Supp. 2d 322, 326 (E.D.N.Y. 1999).  When parties enter into an agreement with a forum-selection clause, they "effectively represent to each other that the agreed forum is not so inconvenient that enforcing the clause will deprive either party of its day in court, whether for costs or other reasons." *In re Lyon Financial Services, Inc.*, 257 S.W. 3d 228, 234 (Tex. 2008).  Texas public policy favors the enforcement of forum selection clauses. *Haynsworth*, 121 F.3d at 965-69.  Ventures knowingly chose a non-American insurance company and freely bargained for an insurance policy which contained a forum selection clause requiring

a foreign forum in the Carribean.  If sophisticated parties to a contract, one of which is a foreign entity, at the time of contracting an international agreement were aware of the inconvenience of the chosen forum, that inconvenience also does not render the forum selection clause unenforceable unless the party seeking to escape his contract shows that for all practical purposes he will be deprived of his day in court.  *Hartash Constr., Inc. v. Drury Inns, Inc.*, 252 Fed. App'x 436, ___, No. 00-31120, 2001 WL 361109, *2 (5th Cir. Mar. 23, 2001), *citing Bremen*, 407 U.S. at 16-18.  No such showing has been made here.  Ventures' and FFD2's argument that the St. Lucia forum will deprive them of their day in court is not persuasive.  "'The Supreme Court has . . . instructed American courts to enforce [forum-selection] clauses in the interests of international comity and out of deference to the integrity and proficiency of foreign courts.'"  *Bancroft Life*, 2012 WL 2368302 at *5, *quoting Mitsui & Co. (USA), Inc., v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997), *citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985).

Bancroft points out with a supporting document that St. Lucia has a legal system based on English common law, an independent judiciary, right to appeal, and English as its official language. Although FFD2 and Ventures further argue that they will be deprived of their day in court because they will not be allowed a jury trial in St. Lucia, numerous courts have held that "a lack of jury trials

does not render a forum inadequate." *Bancroft Life*, 2012 WL 2368302. at *5 (collecting cases[25]).  FFD2 and Ventures have not objected to nor controverted these decisions.

It is not against public policy under federal or Texas law for a party to waive its right to trial by jury. *Alternative Delivery Solutions*, 2005 WL 1862631, *12, *citing Scherck*, 417 U.S. 506 (permitting parties to contract for foreign arbitration), and *In re Prudential Ins. Co. of America*, 148 S.W. 3d 124, 131 (Tex. 2004)("Public policy that permits parties to waive trial altogether does not forbid waiver of trial by jury.'").  In Texas forum selection clauses are treated similarly to arbitration clauses and

---

[25] *See, e.g., Interam. Trade Corp. v. Companhia Fabricadora de Pecas*, 973 F.2d 487 (6th Cir. 1992)(freely negotiated forum selection clause in private international agreement that required litigation of disputes in Brazil was enforceable even thought plaintiff would not be afforded a jury trial); *Alternative Delivery Solutions, Inc. v. R.R. Donnelly & Sons*, No. Civ. SA05CA0172-XR, 2005 WL 1862631, *12-13 (W.D. Tex. July 8, 2005); *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 23-24 (1st Cir. 2009); *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991); *In re Union Carbide Corp. Gas Plant Disaster at GBhopal, India in Dec., 1984*, 809 F.2d 195, 199 (2d Cir. 1987), *cert. denied*, 484 U.S. 871 (1987).  In *Bancroft*, Judge Werlein quoted the *Alternative Delivery* court at *12,

> To invalidate all forum selection clauses that designate forums that do not provide for a jury trial would implicate many of the comity concerns raised by the Supreme Court in *The Bremen* and other cases concerning international agreements.  Further, Plaintiff's argument that being deprived of its right to jury trial will "for all practical purposes . . . prevent [plaintiff] from having its day in court" is wholly unconvincing, for such a conclusion would presumptively invalidate all bench trials and arbitration clauses.

public policy strongly favors the enforcement of both. *Flying Diamond-West Madisonvillle L.P. v. GW Petroleum, Inc.*, No. 10-07-00281-CV, 2009 WL 2707405, *11 (Tex. App.--Waco Aug. 26, 2009), *citing In re Automated Collection Technologies, Inc.*, 156 S.W. 3d 557, 559 (Tex. 2004).

FFD2 and Ventures argue that their claims are compulsory counterclaims to Bancroft's loan claims. Forum selection clauses preclude a party from asserting a claim, even as a compulsory counter claim, in another jurisdiction. *Karl Koch Erecting Co. v. New York Convention Center Development Corp.*, 838 F.2d 656, 659 (2d Cir. 1988); *Yakin v. Tyler Hill Corp.*, 566 F.3d 72 (2d Cir. 2009)("Parties are free to bind themselves to forum selection clauses that trump what would otherwise be a right to remove cases to federal courts."); *Bancroft Life & Cas. ICC, Ltd. v. FFD Resources III, LLC*, Civ. A. No. H-11-2382, 2012 WL 2368302, *4 (S.D. Tex. June 21, 21012), *citing Publicis Communication v. True North Communications, Inc.*, 132 F. 363, 366 (7th Cir. 1997)(Easterbrook, J.)("If the parties promise to litigate a dispute only in a particular forum, a party to that contract cannot seek to bar the litigation in that forum because the claim was not presented in some other forum.").

## IV.   Count 9 of the Counterclaims

Count 9 seeks a declaratory judgment on the Promissory Notes, "to define the rights and other legal relations of Bancroft and

FFD, specifically:  that the loan-back promissory notes are not due and owing, that Bancroft has sufficient reserves in its premium account to offset the amounts purportedly due, and that FFD owes no money with respect to the loan-back promissory notes." #22, ¶ 129. As discussed, the loan claims based on the promissory notes belong to FFD2.  Thus Ventures' request for declaratory relief on the Notes is dismissed with prejudice.  Bancroft's claims regarding the Promissory Notes may proceed before this Court.  Those claims arising out of or relating to insurance policy claims must be brought in St. Lucia.

Accordingly, for the reasons indicated above, the Court

ORDERS that the Magistrate Judge's order permitting joinder of Ventures under Rule 20(a) is OVERTURNED under Rule 21 and claims by Ventures based on the Promissory Notes are DISMISSED with prejudice for lack of standing, while claims by Ventures arising out of or relating to the insurance policy are DISMISSED without prejudice for improper venue under the forum selection clause.  Thus Bancroft's motion to dismiss counterclaims arising out of or related to the insurance policy is GRANTED without prejudice for improper venue.  Bancroft's claims against FFD2 based on the

Promissory Notes remain pending.

**SIGNED** at Houston, Texas, this 1st day of August, 2012.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE